# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

COURTENAY M. MINER,

    Plaintiff,

v.

SPECIALIZED LOAN SERVICING LLC; NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING; 1900 CAPITAL TRUST III, BY U.S. BANK TRUST NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS CERTIFICATE TRUSTEE a/k/a MCM CAPITAL, LLC; and JOHNSON, BLUMBERG & ASSOCIATES, LLC

    Defendants.

CIVIL ACTION: 2:21-cv-00107

COMPLAINT

JURY TRIAL DEMANDED

## COMPLAINT

**NOW COMES** Plaintiff, COURTENAY M. MINER, by and through his undersigned counsel, complaining of the Defendants, SPECIALIZED LOAN SERVICING, LLC, NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING, 1900 CAPITAL TRUST III, BY U.S. BANK TRUST NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS CERTIFICATE TRUSTEE a/k/a MCM CAPITAL, LLC, and JOHNSON, BLUMBERG & ASSOCIATES, LLC (collectively, "Defendants"), as follows:

## NATURE OF ACTION

1.    Plaintiff brings this action seeking redress for breach of contract, breach of duty of good faith and fair dealing, unjust enrichment, violations of the Wisconsin Deceptive Trade Practices Act ("WDTPA"), intentional infliction of emotional distress, fraudulent

1

misrepresentation, violations of the Truth in Lending Act ("TILA"), violations of the Fair Debt Collection Practices Act ("FDCPA"), wrongful death, and violations of the Wisconsin Consumer Act ("WCA").

2.  Plaintiff's claims arise from Defendants' collective attempts to foreclose on Plaintiff's home without a factual or legal basis. As set forth herein, Defendants terrorized Plaintiff and his now deceased wife Tiffany D. Miner ("Tiffany") for over a year by attempting to steal their family home through deceptive and unconscionable means.

## JURISDICTION AND VENUE

3.  Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§1331 and 1337 as the action arises under the laws of the United States.

4.  The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

5.  Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because all of the events or omissions giving rise to the claims occurred in this judicial district.

## PARTIES

6.  COURTENAY M. MINER ("Plaintiff" or "Courtenay") is a natural person over 18-years-of-age who, at all times relevant, owned and resided at the property located at 4918 N. 66th Street, Milwaukee, Wisconsin ("subject property"). Plaintiff and Tiffany (collectively, "the Miners") were married for 20 years until Tiffany's sudden death in January 2020.

7.  SPECIALIZED LOAN SERVICING, LLC ("SLS") is a limited liability company organized under the laws of the State of Delaware. SLS maintains its principal place of business in Highland Ranch, Colorado. SLS is a national mortgage servicer that services thousands of mortgage loans nationwide.

2

8. NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING ("Shellpoint") is a limited liability company organized under the laws of the State of Delaware. Shellpoint maintains its principal place of business in Fort Washington, Pennsylvania. Shellpoint is a national mortgage servicer that services thousands of mortgage loans nationwide.

9. 1900 CAPITAL TRUST III, BY U.S. BANK TRUST NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS CERTIFICATE TRUSTEE a/k/a MCM CAPITAL, LLC ("1900 Capital") is an investment enterprise that purchases mortgage loans in bulk after origination. After the acquisition of mortgage loans, 1900 Capital assigns loan-servicing duties to third party mortgage servicers. The mortgage servicers provide 1900 Capital with day-to-day loan servicing services, including the collection of payments from borrowers, which are then transmitted to 1900 Capital.

10. JOHNSON, BLUMBERG, LLC ("Johnson Blumberg") is a multi-state law firm with offices in Wisconsin, Illinois, Indiana, Michigan, and Iowa. Johnson Blumberg specializes in the representation of creditors in residential mortgage foreclosure actions.

## FACUTAL ALLEGATIONS

11. On March 21, 2005, Plaintiff obtained a mortgage loan ("subject loan") from M&I Marshall and Ilsely Bank ("M&I").

12. The subject loan was secured by the subject property.

13. M&I was eventually acquired by BMO Harris Bank and BMO Harris Bank became the owner of the subject loan.

14. At some point in time, 1900 Capital acquired the subject loan and became the owner of the subject loan.

3

15.     In January 2018, 1900 Capital assigned servicing rights to the subject loan to SLS and SLS became the mortgage servicer for the subject loan.

16.     At the time SLS acquired servicing rights to the subject loan, the Miners' mortgage payment was $852.71.

17.     At the time SLS acquired servicing rights, the subject loan was one month in default.

18.     As soon as SLS began servicing the subject loan, SLS initiated aggressive collection efforts to collect on the subject loan.

19.     Specifically, SLS would place daily harassing collection calls to Tiffany and send excessive written correspondences to the Miners demanding payment to cure the default on the subject loan.

20.     In response to the incessant collection calls, Tiffany repeatedly requested that SLS cease its collection calls and instead communicate with her in writing.

21.     Despite Tiffany's repeated requests that the harassing collection cease, SLS continued placing harassing collection calls to Tiffany.

22.     On April 17, 2018, SLS sent the Miners a Notice of Default and Intent to Foreclosure, alleging a default of $1,705.42.

23.     At the time SLS sent the Notice of Default and Intent to Foreclose, the Miners were two months behind on their mortgage payments.

24.     On January 9, 2019, SLS sent the Miners a correspondence offering the Miners a loan modification.[1]

---

[1] Loan modifications are designed to prevent homeowners from losing their homes. Loan modifications typically change the terms of the loan by extending the repayment period without reducing the principal

4

25.     The correspondence stated, in pertinent part:

*Modify your mortgage.* You are approved to enter into a trial period plan. This is the first step toward qualifying for more affordable mortgage payments. Please read this letter so that you understand the steps you need to take to successfully complete the trial period plan and **permanently modify your mortgage payments**. (emphasis added)

26.     The correspondence further stated:

ACT NOW TO MODIFY YOUR LOAN!
MAKE YOUR TRIAL PAYMENT
NO LATER THAN: 2/1/2019

**To accept this offer**, you must make the first monthly "trial period payment" by the date shown below. **To be approved for a permanent modification**, you must make the following trial period payments in a timely manner:

| | | |
|---|---|---|
| 1st Payment: | $704.75 | by 2/1/2019 |
| 2nd Payment: | $704.75 | by 3/1/2019 |
| 3rd Payment: | $704.75 | by 4/1/2019 |

(emphasis in original)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

After you make all trial period payments in a timely manner and submit all required documents, your mortgage will be permanently modified as described herein. (Your existing loan and loan requirements remain in effect and unchanged during the trial period.) **If each trial payment is not received by Specialized Loan Serving [sic] LLC ("SLS") in the month in which it is due, your loan will not be modified under the terms described in this offer.** (emphasis in original)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**If you accept this offer as described above and otherwise comply with the terms of the trial period plan, we will not proceed to foreclosure sale during the trial period.** (emphasis in original)

---

balance owed on the loan. The extension of the repayment period typically results in a reduced monthly payment, making it more affordable for the homeowners.

5

27.     In February 2019, the Miners made the first trial payment in the amount of $704.75.

28.     In March 2019, the Miners made the second trial payment in the amount of $704.75.

29.     In April 2019, the Miners made the third trial payment in the amount of $704.75.

30.     In April 2019, after the Miners made the third and final trial payment, Tiffany called SLS to inquire about the permanent loan modification.

31.     During this call, an SLS representative advised Tiffany that SLS will mail the Miners documents to memorialize the permanent loan modification.

32.     Shortly thereafter, the Miners discovered that SLS placed all their trial payments in suspense and did not apply the payments to interest, principal, and escrow as required by the terms of the subject loan and mortgage.

33.     On May 12, 2019, after the Miners made all the trial payments required by the loan modification offer, SLS sent the Miners another Notice of Default and Notice of Intent to Foreclose, this one alleging a six-month default and demanding payment of $5,307.67.

34.     On May 20, 2019, SLS sent the Miners a mortgage statement alleging a default of $5,329.64.

35.     On or about May 22, 2019, concerned with the default notices, Tiffany placed a phone call to SLS to inquire about the permanent loan modification and to express her concerns regarding the erroneous default notices.

36.     During this call, a SLS representative falsely represented to Tiffany that the March 2019 payment (2nd trial payment) was returned due to insufficient funds in Tiffany's account and that the permanent loan modification was "cancelled" due to non-payment.

6

37.     In response, Tiffany explained to the SLS representative that the funds for the March 2019 payment were withdrawn from the Miners' bank account and that Tiffany would send proof of the withdrawal to SLS via email.

38.     After the call ended, Tiffany sent proof of the withdrawal of the March 2019 payment to SLS via email.

39.     Also on May 22, 2019, bewildered by SLS' inexplicable recession of the permanent loan modification, Tiffany sent another email to SLS explaining that Plaintiffs made all the trial plan payments required of them and demanded that SLS send documentation to complete the permanent loan modification.

40.     Shortly thereafter, Tiffany placed another call to SLS to inquire about the permanent loan modification.

41.      During this call, a SLS representative advised Tiffany (1) that the Miners' March 2019 payment was located; (2) that the trial plan payments made by the Miners were improperly applied by SLS, causing some internal discrepancies that have now been resolved, and (3) that SLS would honor the permanent loan modification in light of the Miners' completion of the trial plan payments.

42.     On May 29, 2019, the Miners received a correspondence from Shellpoint stating that effective June 7, 2019, Shellpoint would be the new servicer for the subject loan.

43.     The imminent servicer change distressed the Miners as the Miners were concerned that Shellpoint would not have any knowledge of the permanent loan modification that SLS offered to the Miners.

44.     As a result, Tiffany made daily calls to SLS in an attempt to obtain the permanent loan modification documentation prior to the imminent servicing change.

7

45.     On June 6, 2019, during a phone call with SLS, SLS' representative repeatedly assured Tiffany that the subject loan was in fact modified and that the new servicer Shellpoint would honor the permanent loan modification.

46.     Also during the June 6, 2019 call, SLS' representative advised Tiffany that the prospective monthly mortgage payments in the amount of $704.75 should be made to the new servicer Shellpoint.

47.     On June 7, 2019, Shellpoint began servicing the subject loan.

48.     Upon information and belief, SLS did not adequately notify Shellpoint of the permanent loan modification that the Miners secured.

49.     As soon as Shellpoint began servicing the subject loan, Shellpoint treated the subject loan as in default and assigned the subject loan to its loss mitigation department, a department that handles delinquent loans.

50.     Shortly after Shellpoint began servicing the subject loan, Tiffany called Shellpoint to make the June 2019 payment.

51.     During this call, Shellpoint's representative advised Tiffany that any payment made by the Miners would not be applied to principal because the subject loan was in default.

52.     At this point, Tiffany realized that her biggest fear had come to true, SLS did not notify Shellpoint of the permanent loan modification and Shellpoint would not be honoring the same.

53.     In a panicked state, Tiffany sent Shellpoint the SLS loan modification offer and proof of the trial plan payments ("proof documents") and requested that Shellpoint honor the permanent loan modification entered between Plaintiff and SLS.

8

54. After sending the proof documents to Shellpoint, Shellpoint repeatedly failed to acknowledge receipt of the same. Instead, Shellpoint repeatedly and falsely advised Tiffany that Shellpoint did not receive the proof documents despite the fact that Shellpoint was in possession of the same.

55. Frustrated with Shellpoint's failure to acknowledge receipt of the proof documents, Tiffany advised a Shellpoint representative that the Miners would be retaining counsel to compel Shellpoint to honor the permanent loan modification.

56. In response to Tiffany's threat to retain counsel, Shellpoint finally acknowledged receipt of the proof documents.

57. After acknowledging receipt of the proof documents, a Shellpoint representative advised Tiffany that Shellpoint would honor the permanent loan modification and that Shellpoint was working with SLS to memorialize the permanent loan modification.

58. Despite Shellpoint's representation that it would honor the permanent loan modification, Shellpoint continued to harass the Miners with default notices.

59. On June 17, 2019, Shellpoint sent the Miners a "Welcome" letter that stated that the first payment to Shellpoint in the amount of **$878.96** (payment amount prior to the permanent loan modification) was due on **January 1, 2019**, over six months *prior* to the date that the Miners received the June 17, 2019 correspondence.

60. Notably, the monthly payment of $878.96 demanded by Shellpoint was $174.21 more than the $704.75 monthly payment that SLS' representative advised Tiffany would be due under the permanent loan modification. *See* Paragraph 46.

9

61. On June 22, 2019, Shellpoint sent the Miners a mortgage statement stating that the Miners were $5,113.21 past due and that the subject loan was contractually due for January 1, 2019.

62. Shortly after receiving the June 22, 2019 mortgage statement, Tiffany called Shellpoint to make the July 2019 mortgage payment.

63. Upon speaking to a Shellpoint representative, Tiffany was informed that Shellpoint would not be accepting payment unless the payment was sufficient to pay the erroneous default amount, which was over $5,000.

64. On July 18, 2019, Johnson Blumberg sent the Miners a correspondence stating that the subject loan "has been referred to our law firm for the institution of a foreclosure lawsuit against [the subject property].

65. The correspondence from Johnson Blumberg further stated that 1900 Capital is the "present creditor" that the subject loan is owed to.

66. On July 19, 2019, one day after receiving the correspondence from Johnson Blumberg threatening foreclosure proceedings, Shellpoint sent the Miners a correspondence further threatening foreclosure. The correspondence stated, in pertinent part:

> The above referenced mortgage loan, serviced by Shellpoint Mortgage Servicing ("Shellpoint"), on the above referenced property is in default and foreclosure proceedings have or may soon commence. Because you have not taken steps to resolve the delinquency, we have been instructed by the owner of your mortgage loan to commence foreclosure.
>
> In addition to foreclosing on the property, the owner of the mortgage may seek a deficiency judgment against you if the proceeds from the foreclosure sale do not pay off the amount you owe on the mortgage loan.

67.     The correspondence also conveyed loss mitigation offers to the Miners, such as a loan modification or a forbearance plan.

68.     After receiving the foreclosure threats from Johnson Blumberg and Shellpoint, Tiffany repeatedly called Shellpoint in a state of panic to advise Shellpoint that the foreclosure proceedings would be without a factual or legal basis as the permanent loan modification deemed the subject loan contractually current.

69.     Tiffany's desperate pleas to Shellpoint fell on deaf ears. Specifically, Shellpoint disregarded Tiffany's pleas and instead repeatedly gave Tiffany the run-around.

70.     Shellpoint's failure to acknowledge the permanent loan modification and threats of an imminent foreclosure filing set the Miners into a perpetual state of fear and anxiety.

71.     On August 19, 2019, the Miners sent a qualified written request ("QWR") pursuant to the Real Estate Settlement Procedures Act to Shellpoint requesting, *inter alia:* (1) a loan history for the subject loan; (2) a payment history for the subject loan; and (3) a payoff quote for the subject loan.

72.     Moreover, the QWR demanded that Shellpoint cease its erroneous collection activity on the subject loan, including the cessation of collection calls to the Miners' home and Tiffany's work.

73.     On September 4, 2019, Shellpoint finally sent the Miners documentation to finalize the permanent loan modification ("Modification Agreement").

74.     The Modification Agreement stated that upon execution, the subject loan would be retroactively modified as of June 1, 2019 and that the prospective monthly payments would be $853.20.

11

75. The Modification Agreement further stated, in pertinent part, that the subject loan would not be modified until Shellpoint "accepts this Agreement by signing and returning a copy" of the Modification Agreement to the Miners.

76. On September 17, 2019, the Miners executed the Modification Agreement and sent the executed version to Shellpoint.

77. Upon receipt of the executed Modification Agreement, Shellpoint advised the Miners that Shellpoint would not counter-sign the Modification Agreement because the subject loan was in default for months that post-date June 1, 2019, the effective date of the Modification Agreement.

78. Notably, the only reason the subject loan was allegedly in default for the months after the effective date of the Modification Agreement was because Shellpoint refused to accept payments from the Miners, therefore rendering it impossible for the Miners to make payments for the months that Shellpoint now cites as the basis for the default.

79. More importantly, Shellpoint's refusal to counter-sign the Modification Agreement was without a factual or legal basis because the Miners satisfied all the terms set forth the in the Modification Agreement, namely the completion of the trial plan payments.

80. In other words, the Modification Agreement was dependent on payment of the trial plan payments, which were made by the Miners, and not on any payments that became due after June 1, 2019.

81. On September 24, 2019, Shellpoint responded to the Miners' QWR.

82. Shellpoint's response stated that (1) the **subject loan was 9 months past due,** and (2) that the QWR "does not provide any specific details or event regarding the servicing errors or any other specific information on which we can form the basis for further investigation."

12

83. Shellpoint's response highlighted its utter refusal to address the Miners' grievances and further exacerbated the Miners' anxiety and fear arising from the prospect of losing their home.

84. Between September 2019 and November 2019, the Miners repeatedly requested that Shellpoint honor the terms of the Modification Agreement and counter-execute the same.

85. Again, the Miners' requests and pleas fell on deaf ears and Shellpoint refused to counter-execute the Modification Agreement and continued to erroneously treat the subject loan as in default.

86. On November 18, 2019, Shellpoint sent the Miners a mortgage statement erroneously alleging a default amount of $10,334.78

87. On November 27, 2019, Johnson Blumberg, on behalf of 1900 Capital, filed a foreclosure lawsuit against the Miners and the subject property in the Circuit Court of Milwaukee County, styled 2019-CV-009095: *1900 Capital Trust III, By U.S. BANK TRUST NA. v. Tiffany D. Miner et al.* ("foreclosure case").

88. The Miners were apprised of the foreclosure case upon receiving a mail solicitation from a foreclosure defense attorney.

89. Soon thereafter, the Miners retained counsel ("Miners' counsel") to protect their rights and facilitate the dismissal of the unlawful foreclosure case.

90. On December 23, 2019, Miners' counsel sent a written correspondence to Johnson Blumberg advising Johnson Blumberg that the foreclosure filing was erroneous because (1) the Modification Agreement rendered the Miners current as of June 1, 2019 and (2) Shellpoint refused to accept the Miners' payments.

13

91.     The correspondence further requested dismissal of the foreclosure case by January 10, 2020, and notified Johnson Blumberg that the Miners have been and continue to be significantly harmed by the chronic mishandling of the subject loan.

92.     Johnson Blumberg did not respond to Miners' counsel's December 23, 2019 correspondence and continued its prosecution of the foreclosure case.

93.     Accordingly, the Miners were forced to retain different counsel to defend the foreclosure case.

94.     On January 28, 2020, Tiffany tragically suffered a fatal heart attack.

95.     Tiffany's death was highly mysterious because Tiffany did not have any pre-existing conditions and was relatively healthy at the time of her death.

96.     After Tiffany's death, Johnson Blumberg continued its prosecution of the foreclosure case and Shellpoint continued its erroneous collection efforts.

97.     On March 19, 2020, Shellpoint sent the Miners a mortgage statement erroneously alleging a default of $16,958.20 and falsely stating that the subject loan was 443 days delinquent.

98.     The mortgage statement further stated that "you are late on your loan payments and the foreclosure process has been initiated" and that "[f]ailure to bring your loan current may result in fees and foreclosure -- the loss of your home."

99.     On March 10, 2020, Johnson Blumberg, on behalf of 1900 Capital, filed a Motion for Default Judgment in the foreclosure case.

100.    As part of the Motion for Default Judgment, Johnson Blumberg filed an affidavit containing inflated default amounts, erroneous late charges, erroneous default fees, and erroneous attorney's fees, and costs.

14

101. The Motion for Default Judgment caused Courtenay extreme anxiety and compelled Courtenay to pay off the subject loan before he lost his family's home through the erroneous foreclosure proceedings.

102. On March 17, 2020, the Miners' counsel Larraine McNamara-McGraw filed her appearance on behalf of Courtenay in the foreclosure case.

103. On April 10, 2020, Johnson Blumberg, on behalf of 1900 Capital, provided Courtenay with a payoff amount of $79,630.02, which comprised of erroneous fees and charges, including attorney's fees and costs associated with the frivolous foreclosure case.

104. Fed up with havoc caused by the chronic mishandling of the subject loan, Courtenay paid off the subject loan in May 2020 with life insurance proceeds that became payable upon Tiffany's death.

105. On May 22, 2020, as a result of the payoff of the subject loan, the foreclosure case was voluntarily dismissed.

106. At all times relevant, SLS and/or Shellpoint were servicing the subject loan on behalf of 1900 Capital and were therefore agents of 1900 Capital.

107. At all times relevant, 1900 Capital had a consensual agency relationship with SLS and/or and Shellpoint whereby 1900 Capital (as the principal) had the right to control and direct the activities of SLS and/or Shellpoint and SLS and/or Shellpoint had the authority to act on behalf of 1900 Capital (as the agents of 1900 Capital). 1900 Capital, as the principal of SLS and/or Shellpoint, is liable for the acts of SLS and/or Shellpoint and its agents.

108. At times relevant, 1900 Capital had a consensual agency relationship with Johnson Blumberg whereby 1900 Capital (as the principal) had the right to control and direct the activities of Johnson Blumberg and Johnson Blumberg had the authority to act on behalf of 1900 Capital (as

15

the agent of 1900 Capital). 1900 Capital, as the principal of Johnson Blumberg, is liable for the acts of Johnson Blumberg and its agents.

## DAMAGES

109.    Prior to Defendants entering the Miners' lives, the Miners were healthy individuals that had no prior serious medical conditions.

110.    Defendants' collective conduct as outlined herein wreaked havoc on the Miners' lives and devastated their quality of life.

111.    As set forth extensively above, Defendants literally attempted to steal the Miners' family home and nearly succeeded.

112.    As a result of Defendants' collective conduct, the Miners suffered agonizing emotional distress, depression, mental anguish, and anxiety.

113.    Ultimately, Defendants' collective conduct was the proximate cause of Tiffany's death.

114.    Specifically, Tiffany did not have any serious pre-existing conditions prior to her death and the primary stressor in her life was Defendants' irresponsible handling of the subject loan.

115.    Prior to her death, Tiffany spent hundreds of hours dealing with Defendants' mishandling of the subject loan.

116.    Saving her family's home preoccupied Tiffany's life until her tragic death on January 28, 2020.

117.    Defendants' reckless conduct in repeatedly refusing to honor the Modification Agreement, unilaterally changing the terms of the Modification Agreement, and attempting to steal the Miners' family home culminated in the ultimate loss, the loss of a human life.

16

118.    Due to Defendants' collective conduct, the Miners lived in a state of perpetual fear and anxiety arising from Defendants' unwavering mission to foreclose on the Miners' family home.

119.    Moreover, prior to Tiffany's death, Defendants' collective conduct destroyed the Miners' marriage as Defendants' reprehensible conduct caused the Miners to be perpetually stressed, irritable, and aggravated, thus adversely affecting the Miners' day-to-day relations with each other.

120.    As a result of Defendants' conduct, Courtenay has lost his spouse of 20 years and mother of his child.

121.    All of the Miners' damages could have been avoided had Defendants exercised *any* diligence and honored the Modification Agreement that was rightfully secured by the Miners.

122.    Instead, Defendants harassed the Miners with never-ending default notices, false representations regarding the status of the subject loan, and the filing of frivolous foreclosure proceedings against the Miners and the subject property.

123.    Defendants' egregious conduct caused the Miners to lose equity in the subject property as a result of the erroneous assessment of late fees, compounding interest, and fees associated with the foreclosure case, all which increased the balance of the subject loan and in turn ate away at the Miners' equity.

124.    The Miners paid the unauthorized fees and additional interest when Courtenay paid off the subject loan, thus resulting in monetary loss.

125.    The Miners were also forced to retain counsel to defend the foreclosure case, incurring attorney's fees and costs.

17

126. Moreover, Courtenay suffered the loss of the life insurance proceeds, which were utilized to save his family's home from the wrongful foreclosure that was filed against the Miners and the subject property.

127. As a result of Defendants' disgraceful conduct, Courtenay's quality of life has decreased to a minimal level and will never rebound to its normal state.

128. Moreover, Shellpoint's refusal to accept payments from the Miners after June 1, 2019, the effective date of the Modification Agreement, resulted in adverse credit reporting that has destroyed Courtenay's credit score and general creditworthiness, thus debilitating Courtenay's ability to refinance the subject loan with a more responsible mortgage company.

129. The adverse credit reporting and the permanent public record of the foreclosure case has rendered it impossible for Courtenay to obtain credit with favorable terms as the adverse credit reporting and public record has cast Courtenay as a high risk consumer and damaged his creditworthiness.

## COUNT I

**Breach of Contract**
**(Against 1900 Capital, SLS, and Shellpoint)**

130. All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

131. The Miners were the intended beneficiaries of the mortgage servicing contract between 1900 Capital and SLS.

132. The Miners were the intended beneficiaries of the mortgage servicing contract between 1900 Capital and Shellpoint.

18

133.     Under Wisconsin law, the basic elements of a contract are an "offer, an acceptance, and consideration." *Crawford v. Am. Home Mortg. Servicing*, 2012 U.S. Dist. LEXIS 204531, at *23 (W.D. Wisc. 2012).

134.     The trial modification offer, made by SLS, was accepted upon the Miners tendering payment as expressly provided in the trial modification offer, creating a valid and enforceable contract between the Miners and SLS.

135.     The Modification Agreement is a valid and enforceable contract between the Miners and Shellpoint as "Attorney in Fact for c/o [1900 Capital]."

136.     The Modification Agreement became a binding contract after the Miners successfully completed the trial plan payments set forth in the trial modification offer that was tendered to the Miners by SLS on behalf of 1900 Capital.

137.     1900 Capital, SLS, and Shellpoint are bound by the terms of the loan modification offer and the subsequent Modification Agreement.

138.     The Miners accepted the trial modification offer and Modification Agreement by performing their obligations as set forth by the trial modification offer and subsequent Modification Agreement.

139.     Specifically, the Miners accepted the offer and performed all their obligations under the trial modification offer and subsequent Modification Agreement by, *inter alia*, tendering all trial plan payments required by the loan modification offer to SLS and subsequently executing and returning the Modification Agreement to Shellpoint.

140.     1900 Capital, SLS, and Shellpoint materially breached their respective obligations created by the loan modification offer and subsequent Modification Agreement by, *inter alia*:

19

a.      not applying the Miners' trial payments to the subject loan, instead leaving the funds in a suspense account;

b.      not honoring the Modification Agreement;

c.      rejecting the Miners' timely payments after the June 1, 2019 effective date of the Modification Agreement;

d.      repeatedly deeming the subject loan in default after the Miners performed all their obligations as set forth in the Modification Agreement, which cured any existing default as of the June 1, 2019 effective date;

e.      harassing the Miners with never-ending default notices and threats of foreclosure;

f.      refusing to sign the Modification Agreement until the Miners made payments not required by the Modification Agreement;

g.      unilaterally imposing new terms to the Modification Agreement by pre-conditioning the execution of the Modification Agreement on payments that were not required by the terms of the Modification Agreement;

h.      reporting false derogatory information on the Miners' credit reports;

i.      misapplying the Miners' payments by holding the payments in suspense and not timely applying the payments per the terms of the subject loan, mortgage, and Modification Agreement;

j.      charging unauthorized fees and costs (late fees, inspection fees, legal fees, etc.) not permitted by the terms of the subject loan, mortgage, and Modification Agreement;

k.      charging unauthorized fees and costs (late fees, inspection fees, legal fees, etc.) not permitted by state or federal;

l.      providing an inflated payoff to the Miners that did not account for the Modification Agreement;

m.      filing a wrongful foreclosure;

n.      failing to investigate the Miners' repeated disputes;

o.      failing to adequately respond to the Miners' repeated disputes;

20

p.  perpetually failing to correct their records to reflect the Modification Agreement;

q.  taking action that had the effect of destroying and injuring the Miners' right to receive the fruits of the Modification Agreement;

r.  failing to engage in good faith in their dealings with the Miners;

s.  failing to engage in good faith by dishonoring the Modification Agreement and willfully depriving the Miners of the benefits of the Modification Agreement;

t.  failing to dismiss the foreclosure case after they were put on notice that the Miners have complied with all terms of the Modification Agreement and that there was no factual or legal basis for the foreclosure case.

141.  As stated above, the breach of the loan modification offer and subsequent Modification Agreement by 1900 Capital, SLS, and Shellpoint severely harmed the Miners and Plaintiff is entitled to relief.

142.  Moreover, Plaintiff is entitled to punitive damages for the breach of the loan modification offer and subsequent Modification Agreement because the conduct outlined herein resulted in willful torts (e.g. intentional infliction of emotional distress) accompanied by "wantonness" and "oppression." *See Hunter Douglas Metals, Inc. v. Edward C. Mange Trading Co.*, 586 F. Supp. 926, 929 (7th Cir. 1984) (finding that where a breach of contract contains allegations sufficient to support both a contract claim and an independent tort, both may stand and punitive damages may be awarded if plaintiff is able to sustain his burden under the tort theory.)

**WHEREFORE,** Plaintiff respectfully request that this Honorable Court:

a.  Find that 1900 Capital, SLS, and Shellpoint materially breached their contractual obligations as set forth in the loan modification offer and subsequent Modification Agreement;

b.  Award Plaintiff his actual damages to be determined by the jury;

21

c.     Award Plaintiff punitive damages to be determined by the jury; and

d.     Award Plaintiff any other relief this Honorable Court deems just and proper.

## COUNT II

**Breach of Duty of Good Faith and Fair Dealing**
**(Against 1900 Capital, SLS, and Shellpoint)**

143.     All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

144.     The Miners were the intended beneficiaries of the mortgage servicing contract between 1900 Capital and SLS.

145.     The Miners were the intended beneficiaries of the mortgage servicing contract between 1900 Capital and Shellpoint.

146.      Under Wisconsin law, the basic elements of a contract are an "offer, an acceptance, and consideration." *Crawford v. Am. Home Mortg. Servicing*, 2012 U.S. Dist. LEXIS 204531, at *23 (W.D. Wisc. 2012).

147.     The trial modification offer made by SLS (on behalf of 1900 Capital) was accepted upon the Miners tendering payment as expressly provided in the trial modification offer, creating a valid and enforceable contract between the Miners and SLS.

148.     The Modification Agreement is a valid and enforceable contract between the Miners and Shellpoint as "Attorney in Fact for c/o [1900 Capital]."

149.     The Modification Agreement became a binding contract after the Miners successfully completed the trial plan payments set forth in the trial modification offer that was tendered to the Miners by SLS on behalf of 1900 Capital.

22

150.    1900 Capital, SLS, and Shellpoint are bound by the terms of the loan modification offer and the subsequent Modification Agreement.

151.    The Miners accepted the trial modification offer and Modification Agreement by performing their obligations as set forth by the trial modification offer and subsequent Modification Agreement.

152.    Specifically, the Miners accepted the offer and performed all their obligations under the trial modification offer and subsequent Modification Agreement by, *inter alia,* tendering all trial plan payments required by the loan modification offer to SLS and subsequently executing and returning the Modification Agreement to Shellpoint.

153.    "Under Wisconsin law, the duty of good faith and fair dealing is implied in every contract, the duty amounts to a guarantee by each party to the contract that he or she 'will not intentionally and purposely do anything to prevent the other party from carrying out his or her part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Crawford*, 2012 U.S. Dist. LEXIS 204531, at *34.

154.    The Wisconsin Supreme Court has clarified that "[b]y virtue of the relationship between the parties created by the contract, a special duty arises, the breach of which duty is a tort and is unrelated to contract damages." *Anderson v. Continental Insurance Co.,* 271 N.W. 2d 368, 374 (Wis. 1978). "We emphasize . . . that the tort of bad faith is not a tortious breach of contract. It is a separate intentional wrong, which results from a breach of duty imposed as a consequence of the relationship established by contract." *Id.*

155.    1900 Capital, SLS, and Shellpoint materially breached their respective duties of good faith and fair dealing through the conduct exhibited against the Miners, including, *inter alia:*

23

a. not applying the Miners' trial payments to the subject loan, instead leaving the funds in a suspense account;

b. not honoring the Modification Agreement;

c. rejecting the Miners' timely payments after the June 1, 2019 effective date of the Modification Agreement;

d. repeatedly deeming the subject loan in default after the Miners performed all their obligations as set forth in the Modification Agreement, which cured any existing default as of the June 1, 2019 effective date;

e. harassing the Miners with never-ending default notices and threats of foreclosure;

f. refusing to sign the Modification Agreement until the Miners made payments not required by the Modification Agreement;

g. unilaterally imposing new terms to the Modification Agreement by pre-conditioning the execution of the Modification Agreement on payments that were not required by the terms of the Modification Agreement;

h. reporting false derogatory information on the Miners' credit reports;

i. misapplying the Miners' payments by holding the payments in suspense and not timely applying the payments per the terms of the subject loan, mortgage, and Modification Agreement;

j. charging unauthorized fees and costs (late fees, inspection fees, legal fees, etc.) not permitted by the terms of the subject loan, mortgage, and Modification Agreement;

k. charging unauthorized fees and costs (late fees, inspection fees, legal fees, etc.) not permitted by state or federal;

l. providing an inflated payoff to the Miners that did not account for the Modification Agreement;

m. filing a wrongful foreclosure;

n. failing to investigate the Miners' repeated disputes;

o. failing to adequately respond to the Miners' repeated disputes;

p.     perpetually failing to correct their records to reflect the Modification Agreement;

q.     taking action that had the effect of destroying and injuring the Miners' right to receive the fruits of the Modification Agreement;

r.     failing to engage in good faith in their dealings with the Miners;

s.     failing to engage in good faith by dishonoring the Modification Agreement and willfully depriving the Miners of the benefits of the Modification Agreement;

t.     failing to dismiss the foreclosure case after they were put on notice that the Miners have complied with all terms of the Modification Agreement and that there was no factual or legal basis for the foreclosure case.

156.    As stated above, the respective breaches of the duty of good faith and fair dealing by 1900 Capital, SLS, and Shellpoint severely harmed the Miners and Plaintiff is entitled to relief.

157.    Moreover, Plaintiff is entitled to punitive damages for the breach of the duty of good faith and fair dealing, as Defendants not only intentionally breached their respective duties of good faith and fair dealing, but their conduct in breaching such duty exhibits a showing of evil intent and ill-will and a wanton disregard of its duty to the Miners and Plaintiff, further constituting the type of outrageous conduct that deserves an award of punitive damages in Plaintiff's favor. *Anderson,* 271 N.W. 2d at 379 ("For punitive damages to be awarded in addition to compensatory damages for the tort, there must be a showing of an evil intent deserving of punishment or of something in the nature of special ill-will or wanton disregard of duty or gross or outrageous conduct").

**WHEREFORE,** Plaintiff respectfully request that this Honorable Court:

a.     Find that 1900 Capital, SLS, and Shellpoint materially breached their respective duties of good faith and fair dealing;

b.     Award Plaintiff his actual damages to be determined by the jury;

25

c.      Award Plaintiff punitive damages to be determined by the jury; and

d.      Award Plaintiff any other relief this Honorable Court deems just and proper.

## COUNT III

### Unjust Enrichment
### (Against 1900 Capital and Johnson Blumberg)

158.    All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

159.    Under Wisconsin law, claims for unjust enrichment sound in equity and include the following elements: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under circumstances making it inequitable for the defendant to retain the benefit without payment of its value. *Puttkammer v. Minth,* 266 N.W.2d 361, 363 (Wis. 1978).

160.    The erroneous foreclosure action initiated by 1900 Capital and Johnson Blumberg resulted in Plaintiff conferring a benefit on Defendants in a manner that, under the circumstances, all notions of equity demand such benefit be returned to Plaintiff.

161.    Specifically, by virtue of the erroneous foreclosure action and the harassment suffered by Plaintiff, Plaintiff was compelled to pay off the subject loan in full, including erroneous charges for accrued interest and attorneys' fees that never should have come about.

162.    1900 Capital and Johnson Blumberg, through their concerted conduct, unjustly deprived Plaintiff of money he overpaid due to Defendants' unfair and deceptive handling of the subject loan, further depriving Plaintiff of the benefits of the life insurance proceeds stemming from Tiffany's untimely death.

26

163.    1900 Capital's and Johnson Blumberg's retention of these ill-gotten gains is unjust and unreasonable because Defendants used illegal, deceptive, and unfair business practices to induce or otherwise compel Plaintiff to pay amounts above and beyond his actual liability on the subject loan.

164.    With respect to 1900 Capital, Plaintiff's unjust enrichment claim is asserted as an alternative to his breach of contact claim against 1900 Capital.

**WHEREFORE,** Plaintiff respectfully request that this Honorable Court:

    a.    Find that 1900 Capital and Johnson Blumberg have been unjustly enriched by Plaintiff;

    b.    Award Plaintiff restitution in the form of disgorgement of the ill-gotten gains by 1900 Capital and Johnson Blumberg in an amount to be determined by the jury; and

    c.    Award Plaintiff any other relief this Honorable Court deems just and proper.

## COUNT IV

**Violations of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. §100.18 *et seq.***
**(Against 1900 Capital, SLS, and Shellpoint)**

165.    All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

166.    To prevail on a claim under the Wisconsin Deceptive Trade Practices Act ("WDTPA"), Wis. Stat. §100.18(1), a plaintiff must prove "(1) the defendant made a representation to 'the public' with the intent to induce an obligation; (2) the representation was 'untrue, deceptive or misleading,' and (3) the representation materially caused a pecuniary loss to the plaintiff." *Zimmerman v. Logemann*, 2011 U.S. Dist. LEXIS 52354, at *33 (W.D. Wisc. 2011).

27

167. Defendants 1900 Capital, SLS, and Shellpoint violated the WDTPA by (1) falsely representing to the Miners that they would receive a permanent loan modification if they made all the trial plan payments and (2) failing to honor the Modification Agreement after the Miners made the trial plan payments.

168. Defendants 1900 Capital, SLS, and Shellpoint deceptively induced the Miners into making the trial plan payments without the intention of honoring the Modification Agreement.

169. Specifically, the lack of intention to honor the Modification Agreement is demonstrated by (1) the never-ending default notices after the Miners successfully completed the trial plan payments; (2) the lengthy delay between the date the Miners successfully completed the trial plan payments and the date that the Miners were presented with the sham Modification Agreement; (3) the failure to sign the Modification Agreement unless the Miners made payments not required by the Modification Agreement; (4) the rejection of the Miners' mortgage payments after they successfully completed the trial plan payments; and (5) the baseless foreclosure filing.

170. Plaintiff suffered pecuniary loss as a result of the deceptive acts of 1900 Capital, SLS, and Shellpoint, including but not limited to the loss of the trial payments made by the Miners and the inflated amount paid by Plaintiff to pay off the subject loan.

171. Simply put, 1900 Capital, SLS, and Shellpoint never had the intention to honor the loan modification offer and subsequent Modification Agreement.

172. The sham loan modification offer was designed to squeeze as much money from the Miners prior to the initiation of the premeditated foreclosure proceedings and was made under the false pretense that the payment of the trial plan payments would deem the subject loan current and stave off foreclosure proceedings.

28

173. Plaintiff relied on the false representations of 1900 Capital, SLS, and Shellpoint to his detriment.

174. It was unfair and deceptive for 1900 Capital, SLS, and Shellpoint to treat the subject loan in default when it was current.

175. It was unfair and deceptive for 1900 Capital, SLS, and Shellpoint to continuously attempt to collect amounts they were not entitled to, including but not limited to, fictitious past due amounts, unauthorized late charges, unauthorized inspection fees, and other unauthorized charges.

176. It was unfair and deceptive for 1900 Capital, SLS, and Shellpoint to:

    a.    not apply the Miners' trial payments to the subject loan, instead leaving the funds in a suspense account;

    b.    attempt to collect amounts they were not contractually or legally entitled to;

    c.    deem the subject loan in default when it was current after the Miners performed their obligations under the trial modification offer and Modification Agreement;

    b.    not apply the trial plan payments to the subject loan promptly upon receipt;

    c.    reject the Miners' timely payments and then use the missed payments as the basis for refusing to execute the Modification Agreement;

    d.    report false derogatory information on Plaintiff's credit reports;

    e.    charge unauthorized fees and costs (late fees, inspection fees, legal fees, etc.) not permitted by the subject loan, or applicable state and federal laws;

    f.    place hundreds of collection calls to the Miners after the Miners requested that the calls cease;

    g.    fail to provide accurate payoff figures upon request from the Miners;

    h.    file a wrongful foreclosure case alleging fictitious past due amounts;

    i.    force the Miners to defend against a wrongful foreclosure;

    j.    fail to investigate the Miners' disputes;

k.     fail to adequately respond to the Miners' disputes;

l.     repeatedly fail to correct their records;

m.    falsely represent to the Miners that it would correct the errors they committed when they had no intention of doing so;

n.     employ bad faith tactics in their dealings with the Miners;

o.     dishonor the Modification Agreement and willfully deprive the Miners of the benefits of the Modification Agreement;

p.     refuse to dismiss the foreclosure case after being notified that it lacks merit.

177.    The Miners had no choice but to submit to the abusive conduct of 1900 Capital, SLS, and Shellpoint for over one year.

178.    The overall scheme unleashed on the Miners by 1900 Capital, SLS, and Shellpoint was designed to buffalo the Miners into giving up their family home despite the fact that the subject loan was current pursuant to the express terms of the Modification Agreement.

179.    1900 Capital, SLS, and Shellpoint bullied the Miners into near submission with repeated unfair and deceptive conduct through lies, harassment, intimidation, and deception.

180.    The overall conduct as outlined herein towards the Miners was oppressive and against public policy.

181.    As pled above, the Miners were severely harmed by the conduct of 1900 Capital, SLS, and Shellpoint.

182.    The conduct of 1900 Capital, SLS, and Shellpoint causes substantial injury to consumers generally because:

i.     consumers reasonably expect their mortgage companies to honor loan modifications that are designed to avoid foreclosure proceedings and keep consumers in their homes;

ii.   consumers reasonably expect their mortgage companies to not take money from them under false pretenses prior to initiating premeditated foreclosure proceedings;

iii.   consumers reasonably expect their mortgage companies to accept their payments and promptly apply them to their mortgage loans;

iv.   consumers reasonably expect their mortgage companies to communicate with them truthfully and accurately regarding the status of their loans;

v.   consumers reasonably expect mortgage companies to investigate their disputes/grievances in good faith;

vi.   consumers reasonably expect mortgage companies to make honest efforts to resolve a dispute, instead of misrepresenting facts and ignoring requests and inquiries;

vii.   consumers reasonably expect that their mortgage companies will not take illegal action to bully consumers into giving up their homes;

viii.   consumers reasonably expect mortgage companies to comply with laws designed to protect consumers; and

ix.   consumers reasonably expect mortgage companies to follow state and federal law and their own guidelines.

183.   Upon information and belief, the conduct of 1900 Capital, SLS, and Shellpoint as described herein is part of a pattern and practice designed to enrich 1900 Capital, SLS, and Shellpoint at the expense of unsuspecting consumers.

184.   An award of punitive damages is appropriate because the egregious conduct outlined herein towards the Miners and consumers generally is willful, wanton, and shows a reckless disregard for the rights of the Miners and Wisconsin consumers in general.

185.   Additionally, an award of punitive damages is appropriate to deter 1900 Capital, SLS, and Shellpoint from future misconduct.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

31

a. Enter judgment in Plaintiff's favor and against 1900 Capital, SLS, and Shellpoint for violations of the Wisconsin Deceptive Trade Practices Act;

b. Award Plaintiff his actual damages as determined by the jury;

c. Award Plaintiff punitive damages as determined by the jury;

d. Award Plaintiff his reasonably attorney's fees and costs; and

e. Award Plaintiff any other relief this Honorable Court deems just and proper.

<u>**COUNT V**</u>

**Violations of the Truth In Lending Act ("TILA")**
**(Against SLS and Shellpoint)**

186.	All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

187.	Pursuant to 15 U.S.C. §1639f(a) and C.F.R. §1026.36(c)(1)(i), a mortgage servicer shall credit a payment to the consumer's loan account as of the date of receipt.

188.	SLS and Shellpoint violated 15 U.S.C. §1639f(a) and C.F.R. §1026.36(c)(1)(i) by failing to credit the Miners' payments, including their trial plan payments, as of the date of receipt.

189.	Specifically, instead of crediting the Miners' trial plan payments to the subject loan, SLS held the payments in a suspense account to the detriment of Plaintiffs.

190.	Moreover, instead of accepting and applying the Miners' mortgage payments as required by TILA, Shellpoint rejected the payments under the false premise that the subject loan was in default.

191.	SLS and Shellpoint's repeated failure to timely credit the Miners' payments significantly harmed the Miners. Specifically, the failure to credit the payments resulted in SLS and subsequently Shellpoint treating the subject loan as perpetually in default and ultimately led

to the filing of the foreclosure case as the alleged default increased each time SLS and Shellpoint did not credit the Miners' payments.

**WHEREFORE,** Plaintiff requests that this Honorable Court:

a. Enter judgment in Plaintiff's favor and against SLS and Shellpoint for violations of the Truth in Lending Act;

b. Award Plaintiff his actual damages and statutory damages as determined by the jury;

c. Award Plaintiff his attorney's fees and costs as provided under 15 U.S.C. §1640(a)(3); and

d. Award any other relief as this Honorable Court deems just and appropriate.

## COUNT VI

**Intentional Infliction of Emotional Distress**
**(Against 1900 Capital, SLS, and Shellpoint)**

192.     All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

193.     "To state a claim for intentional infliction of emotional distress under Wisconsin law, a plaintiff must allege '(1) that the defendant's conduct was intentioned to cause emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct was a cause-in-fact of the plaintiff's emotional distress; and (4) that the plaintiff suffered an extreme disabling emotional response to the defendant's conduct.'" *Lenczner v. Fargo*, 2017 U.S. Dist. LEXIS 82713, at *7 (W.D. Wisc. 2017).

194.     The conduct of 1900 Capital, SLS, and Shellpoint as described herein was extreme and outrageous by any reasonable standard and went beyond all possible bounds of decency.

33

195.    There is no question that the conduct was intentioned to cause emotional distress. Specifically, the egregious conduct of stealing the Minors' money, refusing to honor the Modification Agreement, and throwing the Miners into foreclosure naturally results in an extreme disabling emotional response by Plaintiff.

196.    As set forth above, the damages suffered by the Miners were so disabling and extreme that it proximately caused Tiffany's death.

197.    1900 Capital, SLS, and Shellpoint knew that its conduct towards the Miners would inflict severe emotional distress on the Miners.

198.    In the alternative, 1900 Capital, SLS, and Shellpoint are liable for negligent infliction of emotional distress.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

    a.   Enter judgment in Plaintiff's favor and against 1900 Capital, SLS, and  Shellpoint;

    b.   Award Plaintiff his actual damages as determined by the jury;

    c.    Award Plaintiff punitive damages as determined by the jury; and

    d.   Award Plaintiff any other relief this Honorable Court deems equitable and just.

### <u>COUNT VII</u>

**Fraudulent Misrepresentation**
**(Against 1900 Capital, SLS, and Shellpoint)**

199.    All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

200.    To state a claim for fraudulent misrepresentation in Wisconsin, a plaintiff must establish (1) a false representation by defendant; (2) made with intent to defraud and for the

34

purpose of inducing plaintiff to act upon it; (3) reliance by the plaintiff on the false representation; (4) damages as a result of the reliance. *In re Gryzynger*, 29 B.R. 992, 994 (W.D. Wisc. 1983).

201.    1900 Capital, SLS, and Shellpoint made false representations to the Miners with the intent to defraud the Miners by representing to the Miners that the subject loan would be permanently modified if the Miners made the trial plan payments.

202.    The Miners were induced to act and relied on the false representations to their detriment by making the trial period payments.

203.    The Miners' reliance on the false representations were justifiable as the Miners had no reason to believe that their mortgage company would accept their trial plan payments and subsequently refuse to honor the Modification Agreement and permanently modify the subject loan.

204.    As set forth extensively herein, 1900 Capital, SLS, and Shellpoint failed to honor the Modification Agreement and instead continued to deem the subject loan in default and filed baseless foreclosure proceedings against the Miners and the subject property.

205.    As set forth above, the Miners were severely harmed by the fraudulent misrepresentations.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

a.   Enter judgment in Plaintiff's favor and against 1900 Capital, SLS, and  Shellpoint;

b.   Award Plaintiff his actual damages as determined by the jury;

c.   Award Plaintiff punitive damages as determined by the jury; and

d.   Award Plaintiff any other relief this Honorable Court deems equitable and just.

## COUNT VIII

**Violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692 *et seq*. (Against Shellpoint)**

206.     All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

207.     The subject loan is a "debt" as defined by the FDCPA §1692a(5) because the mortgage loan was incurred to finance the purchase of the Miners' principal residence, and thus incurred for "personal, family, or household" purposes.

208.     Shellpoint is a "debt collector" as defined by the FDCPA §1692a(6) because it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

209.     Shellpoint is a "debt collector" as defined by the FDCPA §1692a(6) because the subject loan was allegedly in default when Shellpoint began servicing the subject loan and Shellpoint treated it as such.

210.     At all times relevant, Shellpoint was attempting to collect a debt allegedly owed by the Miners (past due amounts, etc.) to 1900 Capital.

211.     Shellpoint violated 15 U.S.C. §§1692d, 1692e, 1692e(2)(A), 1692e(8), 1692e(10), 1692f, 1692f(1), and 1692c(a)(2).

### a. Violations of §1692d

212.     Pursuant to § 1692d of the FDCPA, a debt collector is prohibited from engaging "in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. §1692d

36

213. Shellpoint engaged in abusive and oppressive conduct towards the Miners by (1) relentlessly attempting to collect fictitious past due amounts and fees from the Miners; (2) rejecting the Miners' payments and then alleging that the Miners failed to make payments; and (3) disregarding the Miners' repeated requests to finalize the Modification Agreement.

214. Such conduct is inherently harassing, abusive, and oppressive and therefore violates §1692d of the FDCPA.

**b. Violations of §§1692e, e(2), e(8), and e(10)**

215. Pursuant to §1692e of the FDCPA, a debt collector is prohibited from making "any false, deceptive, or misleading representation" in connection with the collection of a debt. 15 U.S.C. § 1692e.

216. Section 1692e(2)(A) of the FDCPA prohibits a debt collector from falsely representing the "character, amount, or legal status of any debt." 15 U.S.C. §1692e(2)(A)

217. Section 1692e(10) of the FDCPA prohibits a debt collector from using any false representation or deceptive means to collect or attempt to collet any debt. 15 U.S.C. § 1692e(10)

218. Shellpoint violated §§1692e, e(2), and e(10) by falsely representing to the Miners that the subject loan was in default when in fact that the subject loan was current pursuant to the Modification Agreement.

219. Shellpoint violated §§1692e, e(2), and e(10) by continuously rejecting the Miners' payments under the false pretense that the payments were insufficient to cure the fictitious default.

220. Shellpoint violated §§1692e, e(2), and e(10) by misrepresenting the amount of the alleged default on the subject loan. For example, on March 19, 2020, Shellpoint sent the Miners a mortgage statement falsely alleging a default of $16,958.20. The alleged default was

mathematically impossible as the Modification Agreement rendered the subject loan current as of June 1, 2019.

221.     Section 1692e(8) of the FDCPA prohibits a debt collector from "communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. §1692e(8)

222.     Shellpoint violated §1692e(8) by communicating false credit information to the credit bureaus regarding the Miners and the subject loan. Specifically, Shellpoint falsely reported that the subject loan was in default with inflated default amounts to the credit bureaus when in fact the subject loan was current as of June 1, 2019 pursuant to the Modification Agreement.

### c.   Violations of §§1692f and f(1)

223.     Section 1692f prohibits a debt collector from using unfair or unconscionable means to collect a debt. 15 U.S.C. §1692f

224.     Shellpoint violated §1692f by (1) refusing to honor the loan modification; (2) refusing to execute the Modification Agreement; and (3) requesting payments from the Miners that were not required by the Modification Agreement. Such conduct is unfair and unconscionable by any objective standard and violates the FDCPA.

225.     Section §1692f(1) of the FDCPA prohibits a debt collector from collecting any amount unless such amount is expressly authorized by the agreement creating the debt or permitted by law. 15 U.S.C. §1692f(1)

226.     Shellpoint violated §1692f(1) by attempting to collect amounts not authorized by the terms of the subject loan and Modification Agreement by attempting to collect fictitious past due amounts, late charges, and inspection fees.  The collection of these amounts is only authorized

38

if the subject loan is in default. As stated above, the subject loan was current as of June 1, 2019 (effective date of the Modification Agreement), thus any attempt to collect the aforementioned amounts after June 1, 2019 was not authorized by the subject loan or applicable state and federal law.

### d. Violations of §1692c(a)(2)

227.     Section 1692c(a)(2) of the FDCPA prohibits a debt collector from communicating with a consumer "if the debt collector knows the consumer is represented by an attorney with respect to [a] debt and has knowledge of, or can readily ascertain, such attorney's name and address. . ." 15 U.S.C. §1692c(a)(2)

228.     Shellpoint violated §1692c(a)(2) by communicating with the Miners after it had actual knowledge that the Miners were represented by counsel.

229.     Specifically, as set forth above, on December 23, 2019, the Miners' counsel sent a correspondence to Johnson Blumberg advising Johnson Blumberg that the Miners were represented by counsel and requesting dismissal of the foreclosure case.

230.     Upon information and belief, Johnson Blumberg forwarded the Miners' counsel's December 23, 2019 correspondence to Shellpoint shortly after receipt, therefore putting Shellpoint on notice that the Miners were represented by counsel.

231.     Despite having actual knowledge that the Miners were represented counsel, Shellpoint unlawfully communicated with the Miners by continuing to send written correspondences to the Miners in an attempt to collect the subject loan.

232.     As stated above, the Miners were severely harmed by Shellpoint's conduct.

39

**WHEREFORE,** Plaintiff requests that this Honorable Court:

    a.    Enter judgment against Shellpoint and in favor of Plaintiff for violations of the Fair Debt Collection Practices Act;

    b.    Award Plaintiff statutory damages and actual damages to be determined by the jury;

    c.    Award Plaintiff his reasonable attorney's fees and costs; and

    d.    Award any other relief as this Honorable Court deems just and appropriate.

<u>**COUNT IX**</u>

**Violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692 *et seq*.**
**(Against Johnson Blumberg)**

233.    All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

234.    The subject loan is a "debt" as defined by the FDCPA §1692a(5) because the mortgage loan was obtained to finance the purchase of the Miners' principal residence, and therefore incurred for "personal, family, or household" purposes.

235.    Johnson Blumberg is a "debt collector" as defined by the FDCPA §1692a(6) because it regularly collects or attempts to collect debts owed to third parties.

236.    Johnson Blumberg is a "debt collector" as defined by the FDCPA §1692a(6) because the subject loan was allegedly in default when Johnson Blumberg was retained to collect the subject loan and Johnson Blumberg treated it as such.

237.    At all times relevant, Johnson Blumberg was attempting to collect a debt allegedly owed by the Miners to Johnson Blumberg's client, 1900 Capital.

40

238. Johnson Blumberg violated 15 U.S.C. §§ 1692d, 1692e, 1692e(2)(A), 1692e(10), 1692f, and 1692f(1) through its efforts to collect the subject loan.

### a. Violations of §1692d

239. Pursuant to § 1692d of the FDCPA, a debt collector is prohibited from engaging "in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. §1692d

240. Johnson Blumberg violated §1692d by filing and prosecuting a frivolous foreclosure case against the Miners and the subject property in an effort to collect the subject loan. As set forth extensively above, Johnson Blumberg filed a foreclosure case and subsequent Motion for Default Judgment asserting false default amounts despite having actual knowledge that the foreclosure proceeding was without a factual or legal basis. *See* Paragraphs ¶¶90-91. Such conduct is objectively oppressive and abusive and violates the FDCPA.

### b. Violations of §§1692e, e(2), and e(10)

241. Pursuant to §1692e of the FDCPA, a debt collector is prohibited from making "any false, deceptive, or misleading representation" in connection with the collection of a debt. 15 U.S.C. § 1692e

242. Section 1692e(2)(A) of the FDCPA prohibits a debt collector from falsely representing the "character, amount, or legal status of any debt" in connection with the collection of a debt. 15 U.S.C. §1692e(2)(A)

243. Section 1692e(10) of the FDCPA prohibits a debt collector from using any false representation or deceptive means to collect or attempt to collet any debt in connection with the collection of a debt. 15 U.S.C. § 1692e(10)

41

244. Johnson Blumberg violated §§ 1692e, e(2)(A), and e(10) by falsely representing the default amount and the balance owed on the subject loan in in the foreclosure case complaint and subsequent Motion for Default Judgment that was filed on March 10, 2020 in the foreclosure case.

245. Moreover, Johnson Blumberg violated §§ 1692e, e(2)(A), and e(10) by falsely representing the balance of the subject loan in its April 10, 2020 payoff correspondence to Plaintiffs. Specifically, Johnson Blumberg falsely alleged that the payoff amount of was $79,630.02, when in fact the balance of the subject loan was much lower.

### c.  Violations of §1692f and f(1)

246.  Section 1692f prohibits a debt collector from using unfair or unconscionable means to collect a debt. 15 U.S.C. §1692f

247. Section §1692f(1) of the FDCPA prohibits a debt collector from collecting any amount unless such amount is expressly authorized by the agreement creating the debt or permitted by law. 15 U.S.C. §1692f(1)

248.  Johnson Blumberg violated §§1692f and f(1) by attempting to collect amounts not authorized by the terms of the subject loan and Modification Agreement by attempting to collect fictitious/unauthorized past due amounts, late charges, inspection fees, and attorney's fees.  The collection of these amounts is only authorized if the subject loan is in default. As stated above, the subject loan was current as of June 1, 2019 (effective date of the Modification Agreement), thus any attempt to collect the aforementioned amounts was not authorized by the subject loan or applicable state and federal laws

249. Johnson Blumberg further violated §§1692f and f(1) by filing the foreclosure case and subsequent Motion for Default Judgment despite the fact that the subject loan was current as of June 1, 2019 pursuant to the terms of the Modification Agreement.

250. As set forth above, the Miners attempted to make payments on the subject loan after June 1, 2019 but the payments were rejected by Shellpoint.

251. Accordingly, the subject loan was not in default through any fault of the Miners at the time Johnson Blumberg filed the foreclosure case.

252. Moreover, Johnson Blumberg was notified of the Modification Agreement by the Miners' counsel but made the conscious decision to ignore the existence of the Modification Agreement and continue the prosecution of the foreclosure case.

253. Such conduct is unfair and unconscionable by any objective standard and violates the FDCPA.

**WHEREFORE**, Plaintiffs requests that this Honorable Court:

a. Enter judgment against Johnson Blumberg and in favor of Plaintiff for violations of the Fair Debt Collection Practices Act;

b. Award Plaintiff statutory damages and actual damages to be determined by the jury;

c. Award Plaintiff his reasonable attorney's fees and costs; and

d. Award any other relief as this Honorable Court deems just and appropriate.

## COUNT X

### Wrongful Death
### (Against 1900 Capital, SLS, Shellpoint, and Johnson Blumberg)

254. "Under Wisconsin's wrongful death statute, a person who causes the death of another by a wrongful act is liable for damages whenever the injured party could have maintained

43

an action and recovered damages had death not ensued." *Bowen v. Am. Family Ins. Co.*, 340 Wis. 2d 232, 238-39 (2012).

255. Pursuant to Wisconsin's wrongful death statute, "a wrongful death claim belongs to the deceased's surviving spouse." *Id.* at 239.

256. Accordingly, the wrongful death claim belongs to Plaintiff, Tiffany's surviving spouse.

257. Defendants' collective conduct as outlined herein was the proximate cause of Tiffany's death.

258. Tiffany did not have any major medical issues at the time of her sudden death.

259. The excruciating stress and mental anguish caused by Defendants' collective conduct in trying to steal the Miners' family home culminated in Tiffany's untimely death.

260. Specifically, Tiffany's death was caused by hypertension that led to irreversible and fatal brain damage.

261. The hypertension was proximately caused by the torturing stress and mental anguish arising from Defendants' collective efforts to steal the Miners' family home.

262. As set forth extensively herein, Defendants collectively refused to honor or acknowledge the Modification Agreement that rendered the subject loan current as of June 1, 2019.

263. Instead of honoring and acknowledging the Modification Agreement, Defendants bludgeoned the Miners with never-ending default notices and ultimately the filing of the foreclosure case.

264. Defendants' collective conduct caused Tiffany unbearable stress, mental anguish, and anxiety, which was the proximate cause of the hypertension that led to Tiffany's tragic death.

44

265.    Had Defendants collectively honored and acknowledged the Modification Agreement, Tiffany would be alive today.

266.    As a result of Tiffany's death, Plaintiff has suffered permanent damages, including, the loss of his spouse of 20 years, loss of the mother of his child, loss of companionship, loss of consortium, loss of love, loss of solace, loss of affection, depression, pain and suffering, anxiety, and loss of Tiffany's income.

**WHEREFORE**, Plaintiff requests that this Honorable Court:

a.   Enter judgment in Plaintiff's favor and against 1900 Capital, SLS, Shellpoint, and Johnson and Blumberg for the wrongful death of Tiffany Miner;

b.   Award Plaintiff compensatory damages as determined by the jury;

c.   Award Plaintiff any other relief as this Honorable Court deems just and appropriate.

## COUNT XI

### Violations of the Wisconsin Consumer Act, Wis. Stat. § 427.103 *et seq.*
### (Against 1900 Capital, SLS, Shellpoint, and Johnson Blumberg)

267.    All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

268.    The subject loan is a "claim" as defined by Wis. Stat. § 427.103(1), as it is an obligation or alleged obligation arising from a consumer transaction.

269.    At all times relevant hereto, Defendants engaged in "debt collection" as defined by Wis. Stat. § 427.103(2), as Defendants engaged in any action, conduct, or practice of soliciting claims for collection or in the collection of claims owed or due or alleged to be owed or a due a merchant by a consumer.

45

270. Defendants are "debt collector[s]" as defined by Wis. Stat. § 427.103(3), as they engaged, directly and indirectly, in debt collection.

271. The WCA provides: "In attempting to collect an alleged debt arising from a consumer credit transaction or other consumer transaction . . . where there is an agreement to defer payment, a debt collector may not:" engage in any of the specifically enumerated conduct. *See* Wis. Stat. § 427.104(1).

272. Pursuant to Wis. Stat. § 427.104(1)(g), a debt collector is prohibited from "[c]ommnicat[ing] with the customer or a person related to the customer with such frequency or at such unusual hours or in such a manner as can reasonably be expected to threaten or harass the customer."

273. SLS and Shellpoint violated § 427.104(1)(g) when they communicated with the Miners with such frequency and in a manner that can reasonably have been expected to, and did in fact, harass the Miners. Tiffany repeatedly demanded that the harassing and relentless phone calls stop, yet the calls continued, underscoring the extent to which Defendants' conduct could have expected to harass the Miners. Defendants' conduct was particularly egregious considering that the Miners had done everything they needed to do to retain the benefits of the promised loan modification, which would have obviated the need for the excessive and relentless phone calls.

274. Pursuant to Wis. Stat. § 427.104(1)(h), a debt collector is prohibited from "[e]ngag[ing] in other conduct which can reasonably be expected to threaten or harass the customer or a person related to the customer."

275. 1900 Capital, SLS, Shellpoint, and Johnson Blumberg violated § 427.104(h) through the their egregious conduct towards the Miners. Defendants' entire handling of the subject

loan and treatment of the Miners underscores the extent to which their conduct could reasonably have been expected to, and did in fact, harass the Miners.

276. Further, pursuant to Wis. Stat. § 427.104(1)(j), a debt collector may not "[c]laim, or attempt or threaten to enforce a right with knowledge or reason to know that the right does not exist."

277. 1900 Capital, SLS, Shellpoint, and Johnson Blumberg violated § 427.104(1)(j) through their repeated attempts to collect on the purportedly defaulted payments on the subject loan, when the Defendants knew or should have known that the Miners' undeniable acceptance of the loan modification offer rendered the defaulted payments sought by Defendants erroneous and uncollectible.

278. SLS and Shellpoint repeatedly sent default notices claiming entitlement to purportedly defaulted payments which were not due and owing by the Miners.

279. 1900 Capital and Johnson Blumberg erroneously prosecuted the Miners in a foreclosure proceeding despite having actual knowledge that the Modification Agreement rendered the subject loan current, thus rendering the foreclosure proceeding devoid of a factual or legal basis.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

    a. Enter judgment in Plaintiff's favor and against 1900 Capital, SLS, Shellpoint, and Johnson Blumberg for violations of the Wisconsin Consumer Act;

    b. Award Plaintiff his actual damages as determined by the jury;

    c. Award Plaintiff punitive damages as determined by the jury;

    d. Award Plaintiff his reasonably attorney's fees and costs; and

    e. Award Plaintiff any other relief this Honorable Court deems just and proper.

47

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.


Dated: January 25, 2021

Respectfully Submitted,

/s/ *Mohammed O. Badwan*

Mohammed O. Badwan, Esq.
Nathan C. Volheim, Esq.
Victor T. Metroff, Esq.
Eric D. Coleman, Esq.
*Counsel for Plaintiff*
Sulaiman Law Group, Ltd.
2500 S. Highland Ave., Ste. 250
Lombard, IL 60148
Phone (630) 575-8180
mbadwan@sulaimanlaw.com
nvolheim@sulaimanlaw.com
metroff@sulaimanlaw.com
ecoleman@sulaimanlaw.com