# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

COURTENAY M. MINER,
       Plaintiff,

v.                                **Case No. 21-C-0107**

SPECIALIZED LOAN SERVICING
LLC, et al.,
       Defendants.

_____

## DECISION AND ORDER

Plaintiff Courtenay Miner brings this action under the Fair Debt Collection Practices Act ("FDCPA") and state law against four entities that were involved in the collection of his mortgage. The defendants have filed motions to dismiss the amended complaint for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). As explained below, the amended complaint does not state valid claims under the FDCPA, and therefore those claims must be dismissed. Because the FDCPA claims were the only federal claims remaining in this suit,[1] I will relinquish supplemental jurisdiction over the state-law claims. *See* 28 U.S.C. § 1367(c)(3).

## I. BACKGROUND

According to the allegations of the first amended complaint, which I accept as true for purposes of the motion to dismiss, the plaintiff and his wife, Tiffany, who is now deceased, obtained a home loan in March 2005. The loan was secured by a mortgage on the Miners' residence. Ownership of the loan was transferred several times, and it was

_____

[1] The plaintiff pleaded, but later withdrew, federal claims based on the Truth in Lending Act ("TILA"). (ECF No. 39 at 62 of 64.)

eventually assigned to defendant 1900 Capital Trust III. In January 2018, 1900 Capital assigned loan-servicing duties to defendant Specialized Loan Servicing LLC ("SLS").

At the time SLS began servicing the mortgage, the loan had been in default for one month. The plaintiff alleges that, as soon as SLS took over servicing duties, it "initiated aggressive collection efforts" that included "plac[ing] daily harassing collection calls to Tiffany and send[ing] excessive written correspondences to the Miners demanding payment to cure the default." (Am. Compl. ¶ 19.) SLS's initial collection efforts lasted about one year. (*See id.* ¶¶ 15–24.) Then, on January 9, 2019, SLS sent the Miners a letter offering them an opportunity to participate in a "trial period plan." (ECF No. 36-3 at 2 of 5.[2]) The letter opened by notifying the Miners that they had been selected to participate in a "loss mitigation option" described in the letter. (*Id.*) It then stated:

> ***Modify your mortgage:*** You are approved to enter into a trial period plan. This is the first step toward qualifying for more affordable mortgage payments. Please read this letter so that you understand the steps you need to take to successfully complete the trial period plan and permanently modify your mortgage payments.

(*Id.*) Under the trial period plan described in the letter, the Miners would not have to pay their usual monthly loan payment of $852.71 for three months. Instead, they would pay $704.75 in each of the three months, which SLS would "hold . . . in an account until sufficient funds [were] in the account to pay [the Miners'] oldest delinquent monthly payment." (*Id.* at 5 of 5.) The letter stated that the Miners could accept the offer to

---

[2] The complaint quotes extensively from the letter, but the letter itself is not attached to the complaint. However, defendant 1900 Capital attached a copy of the letter to its motion to dismiss. Because the letter is referred to in the complaint, is central to the plaintiff's claim, and is concededly authentic, I may consider it when deciding the motion to dismiss. *See, e.g., Santana v. Cook County Bd. of Rev.*, 679 F.3d 614, 619 (7th Cir. 2012).

participate in the trial period plan by making the first monthly trial period payment by February 1, 2019. The letter further stated that, if the Miners accepted the offer, SLS would not "proceed to foreclosure sale during the trial period." (*Id.*) Finally, the letter stated that if the Miners made "all trial period payments in a timely manner" and "submit[ted] all required documents," the Miners' mortgage would "be permanently modified as described" in the letter. (*Id.* at 3 of 5.)

The plaintiff alleges that he and Tiffany timely made the first trial payment in February 2019 and thereby accepted the trial period plan. The plaintiff further alleges that he and Tiffany made the second and third payments and thus successfully completed the plan. In April 2019, after the Miners made the final trial payment, Tiffany called SLS to inquire about a permanent loan modification. SLS's phone representative told Tiffany that SLS would mail the Miners documents that were needed to "memorialize" the permanent loan modification. (Am. Compl. ¶ 31.) A short time later, the Miners learned that SLS placed all their trial payments "in suspense" and did not apply them to the interest, principal, and escrow as required by the terms of the loan.[3] (*Id.* ¶ 32.) On May 12, 2019, SLS sent the Miners a notice of default and a notice of intent to foreclose. This notice stated that the loan had been in default for six months and that the amount owed was $5,307.67.

Concerned about the default notice, Tiffany called SLS to inquire about the status of the permanent loan modification. During the call, the phone representative told Tiffany

---

[3] Although the complaint suggests that SLS's placing the trial payments "in suspense" was unlawful, its doing so appears to have been consistent with the terms of the trial period plan, which stated that SLS would hold the payments in an account until sufficient funds were available to pay the oldest delinquent monthly payment.

that the Miners' March trial payment had been returned due to insufficient funds in the Miners' bank account, and that SLS had therefore cancelled the permanent loan modification. Tiffany told the representative that SLS must be mistaken, for it had withdrawn the funds for the March payment from her account. After the call ended, Tiffany sent proof of the withdrawal to SLS and demanded that it recognize that the Miners had successfully completed the trial period plan and therefore were entitled to receive the documentation required to complete the permanent loan modification. A short time later, Tiffany called SLS and spoke with a representative who told her that SLS had made an error in thinking that the Miners' March payment was returned for insufficient funds. This representative also told Tiffany that SLS "would honor the permanent loan modification in light of the Miners' completion of the trial plan payments." (Am. Compl. ¶ 41.)

Meanwhile, 1900 Capital reassigned servicing duties for the Miners' loan from SLS to a different servicer, defendant Shellpoint Mortgage Servicing. On May 29, 2019, the Miners received a letter from Shellpoint stating that, effective June 7, 2019, it would be the new servicer for the loan. This change in servicer concerned the Miners, as they were worried that Shellpoint would not know of the permanent loan modification that SLS had offered the Miners. Acting on this concern, Tiffany again called SLS in an attempt to expedite receipt of the documentation needed to complete the permanent loan modification. (Am. Compl. ¶ 44.) On June 6, 2019, Tiffany spoke with an SLS phone representative, who "repeatedly assured Tiffany that the subject loan was in fact modified and that the new servicer Shellpoint would honor the permanent loan modification." (*Id*. ¶ 45.) The representative also advised Tiffany that the new monthly mortgage payments in the amount of $704.75 should be made directly to Shellpoint. The plaintiff alleges,

4

however, that SLS "did not adequately notify Shellpoint of the permanent loan modification that the Miners secured." (*Id.* ¶ 48.)

On June 7, 2019, Shellpoint began servicing the loan. Later that month, Tiffany called Shellpoint to make the June payment. Shellpoint's phone representative advised Tiffany that the payment she made "would not be applied to principal because the subject loan was in default." (Am. Compl. ¶ 51.) At this point, Tiffany realized that SLS had not notified Shellpoint of the loan modification. In response, she sent Shellpoint the letter that the Miners had received from SLS about the trial period plan, along with proof that all the trial payments had been made on time. Tiffany asked Shellpoint to "honor the permanent loan modification entered between [the Miners] and SLS." (*Id.* ¶ 53.) Initially, Shellpoint failed to acknowledge receipt of these documents. However, once Tiffany threatened to retain counsel, Shellpoint acknowledged receipt and advised Tiffany "that Shellpoint would honor the permanent loan modification and that Shellpoint was working with SLS to memorialize the permanent loan modification." (*Id.* ¶ 57.)

In the meantime, Shellpoint continued to treat the Miners' loan as in default. When Tiffany called Shellpoint to make the July mortgage payment, the phone representative told her that Shellpoint would not accept payment unless it was sufficient to cure the entire default, which Shellpoint believed was over $5,000. (Am. Compl. ¶ 63.) On July 18, 2019, the Miners received a letter from defendant Johnson, Blumberg & Associates ("JBA"). The letter advised the Miners that JBA had been hired to initiate a foreclosure lawsuit against the property. At around the same time, Shellpoint sent its own notice of its intent to foreclose to the Miners. Included with Shellpoint's letter were various "loss mitigation offers" that were less favorable to the Miners than the permanent loan modification that

5

SLS had previously offered. (*Id.* ¶ 67.) Upon receiving these letters, Tiffany again tried to contact Shellpoint and have it proceed with the permanent loan modification under the terms offered by SLS. But for approximately a month and a half, Tiffany's pleas to Shellpoint "fell on deaf ears." (*Id.* ¶ 69.)

On September 4, 2019, Shellpoint sent the Miners the documentation that was needed to finalize the permanent loan modification. (Am. Compl. ¶ 73.) This document was entitled "Modification Agreement." (ECF No. 36-4 at 2 of 6.[4]) Its terms proposed an amendment to the Miners' existing note and mortgage that would be retroactively effective to June 1, 2019. Under the amendment, all unpaid late charges would be waived, and the Miner's new monthly payment would be $853.20 (which included $435.63 in escrow payments). The Modification Agreement stated that it would "not take effect unless the preconditions set forth in Section 2 have been satisfied." (*Id.*) Section 2, in turn, was entitled "Acknowledgements and Preconditions to Modification." (*Id.*) One of the provisions of Section 2 provided that "[t]he Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me." (*Id.*) The Agreement had spaces for the Miners to sign and for Shellpoint to sign as "attorney in fact" for 1900 Capital. (*Id.* at 5–6.)

On September 17, 2019, the Miners executed the Modification Agreement and returned it to Shellpoint. Upon receipt of the executed version, Shellpoint advised the Miners that it would not countersign because the Miners' loan "was in default for months

---

[4] The modification agreement is not attached to the complaint, but defendant 1900 Capital attached a copy to its motion to dismiss. Again, I may consider this document in connection with a motion to dismiss because it is referred to in the complaint, is concededly authentic, and is central to the plaintiff's claim. *See Santana*, 679 F.3d at 619.

6

that post-date June 1, 2019, the effective date of the Modification Agreement." (Am. Compl. ¶ 77.) According to the complaint, the only reason the loan was in default for those months was because Shellpoint had refused to accept payments from the Miners. (*Id.* ¶ 78.) Moreover, the complaint alleges that, because the Miners had successfully made all their trial plan payments and returned the executed Modification Agreement to Shellpoint, the Miners had satisfied the terms for obtaining a permanent loan modification as stated in SLS's letter regarding the trial period plan, and therefore Shellpoint had no legal basis to refuse to countersign. (*Id.* ¶ 79.)

Between September and November 2019, the Miners continued to demand that Shellpoint countersign the Modification Agreement. However, Shellpoint continued to treat the loan as in default. On November 27, 2019, defendant JBA, on behalf of 1900 Capital, filed a foreclosure lawsuit against the Miners and the property in the Circuit Court for Milwaukee County. When the Miners learned of the lawsuit, they retained counsel "to protect their rights and facilitate dismissal of the unlawful foreclosure case." (Am. Compl. ¶ 89.) On December 23, 2019, the Miners' counsel sent a letter to JBA regarding the foreclosure. (ECF No. 35-1.[5]) The letter reveals that the law firm the Miners retained is the same firm that filed the present lawsuit under the FDCPA. In the letter, the Miners' attorney advised JBA of the Miners' view that they had reached an agreement with SLS to permanently modify the loan, that the Miners had provided information to Shellpoint demonstrating that SLS had made them this offer and that the Miners had made all the

---

[5] This letter is not attached to the complaint, but defendant JBA attached a copy to its motion to dismiss. Again, I may consider this document in connection with the motion to dismiss because it is referenced in the complaint, is concededly authentic, and is central to the plaintiff's claims. *See Santana*, 679 F.3d at 619.

7

required trial period plan payments, and that a Shellpoint representative had advised Tiffany that Shellpoint would "honor" the loan modification. (*Id.* at 1–2.) The Miners' attorney stated in the letter that, based on these facts, "the foreclosure proceedings are devoid of any factual or legal basis." (*Id.* at 1.) He demanded that the foreclosure proceeding be dismissed no later than January 10, 2020.

JBA did not respond to the letter from the Miners' lawyer, and the foreclosure action was not dismissed by January 10, 2020. At this point, the Miners retained a different attorney to defend against the foreclosure case.

On January 28, 2020, Tiffany suffered a fatal heart attack. The complaint describes her death as "highly mysterious" because Tiffany did not have any known heart conditions and was "relatively healthy" at the time of her death. (Am. Compl. ¶ 95.) But the complaint also alleges that Tiffany's death was caused by "hypertension that led to irreversible and fatal brain damage." (*Id.* ¶ 261.) The complaint further alleges that "Defendants' collective conduct [relating to the loan and foreclosure] was the proximate cause of Tiffany's death." (*Id.* ¶ 114.)

On March 10, 2020, JBA filed a motion for default judgment in the foreclosure case.[6] (Am. Compl. ¶ 100.) According to the plaintiff, the affidavit that JBA filed in support of the motion contained "inflated default amounts, erroneous late charges, erroneous default fees, and erroneous attorney's fees, and costs." (*Id.* ¶ 101.) On March 17, 2020, the attorney that the Miners had retained to defend against the foreclosure filed her notice of appearance in the foreclosure case. (*Id.* ¶ 103.) On March 19, 2020, Shellpoint sent

---

[6] Despite having been represented by counsel in the foreclosure case, the plaintiff does not dispute that he failed to file a timely response to the foreclosure complaint.

8

Courtenay Miner a mortgage statement that stated that the loan was in default in the amount of $16,958.20 and that, because the loan had been accelerated, the total amount due was $79,071.37. (*Id.* ¶ 97.) The statement further stated that the foreclosure process had been initiated and that failure to bring the loan current "may result in fees and foreclosure—the loss of your home." (*Id.* ¶ 98.)

On April 10, 2020, JBA informed the plaintiff that the payoff amount for the loan was $79,630.02. According to the complaint, this figure was "comprised of erroneous fees and charges, including attorney's fees and costs associated with the frivolous foreclosure case." (*Id.* ¶ 104.) On April 22, 2020, however, Courtenay used the proceeds of Tiffany's life insurance policy to pay this amount. Courtenay wrote "under protest" on the front of the payoff check. (*Id.* ¶ 105.) Once the payoff amount was paid, JBA voluntarily dismissed the foreclosure suit.

The plaintiff commenced the present action on January 25, 2021 against 1900 Capital, SLS, Shellpoint, and the JBA law firm. After all defendants filed motions to dismiss, the plaintiff sought and was granted leave to file an amended complaint. The amended complaint purports to allege federal claims under the FDCPA and the Truth in Lending Act ("TILA") and a host of state-law claims: breach of contract, breach of the duty of good faith and fair dealing, unjust enrichment, violation of the Wisconsin Deceptive Trade Practices Act, intentional infliction of emotional distress, negligent infliction of emotional distress, fraudulent misrepresentation, wrongful death, and violation of Wis. Stat. § 224.74, *et seq.*, which applies to mortgage brokers and related entities.

The common thread through all the plaintiff's claims is that the defendants collectively acted in disregard of the terms of SLS's letter offering the trial period plan and

the permanent loan modification to the Miners. The plaintiff believes that because he and his wife made all trial plan payments on time, SLS, Shellpoint, and 1900 Capital were obligated to permanent modify the loan. Because the defendants treated the loan as unmodified and therefore still in default, the plaintiff argues, their conduct gave rise to the claims alleged in the first amended complaint. Regarding the wrongful death claim, the plaintiff alleges that the defendants' "collective conduct" caused Tiffany Miner to suffer emotional distress that, in turn, led to her fatal heart attack. (Am. Compl. ¶ 113.)

The amended complaint asserts that federal jurisdiction is proper under 28 U.S.C. § 1331 because the complaint pleads federal claims under the FDCPA and the TILA. (Am. Compl. ¶ 3.) The complaint further alleges that the court may exercise supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

The defendants now move to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6).

## II. DISCUSSION

To avoid dismissal under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must, at a minimum, "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. In construing a plaintiff's complaint, I assume that all factual allegations are true but disregard statements that are conclusory. *Iqbal*, 556 U.S. at 678.

10

As noted above, federal jurisdiction is based on the plaintiff's claims under the FDCPA and the TILA. However, after the defendants moved to dismiss the amended complaint, the plaintiff withdrew his TILA claims. (ECF No. 39 at 62 of 64.) Thus, the TILA claims will be dismissed, and only the FDCPA claims remain as a basis for federal jurisdiction. I will therefore address those claims first. The plaintiff asserts FDCPA claims against defendants JBA and Shellpoint only. (Am. Compl. ¶¶ 207–54.) He does not assert FDCPA claims against SLS or 1900 Capital.

## A.    FDCPA: Statute of Limitations

Initially, both JBA and Shellpoint note that most of the conduct alleged in the complaint occurred more than one year before the plaintiff commenced this action on January 25, 2021. But the FDCPA provides that an action may be brought only "within one year from the date on which the violation occurs." 15 U.S.C. § 1692k(d). Thus, the defendants contend, any claims based on FDCPA violations that occurred prior to January 25, 2020 must be dismissed.[7]

The plaintiff does not dispute that his claims based on FDCPA violations that occurred prior to January 25, 2020 must be dismissed pursuant to the statute of limitations. Instead, the plaintiff focuses on the few potential violations that occurred after

---

[7] "A statute of limitations defense, while not normally part of a motion under Rule 12(b)(6), is appropriate where 'the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense, such as when a complaint plainly reveals that an action is untimely under the governing statute of limitations.'" *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 847 (7th Cir. 2008) (quoting *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir.2005)). Here, the complaint identifies the dates on which all alleged FDCPA violations occurred, and thus it plainly reveals which claims are untimely. Therefore, the defendants properly raised the statute-of-limitations defense through a motion under Rule 12(b)(6).

11

that date, namely: (1) JBA's filing the motion for default judgment in the foreclosure action on March 10, 2020, (2) JBA's providing the plaintiff with a payoff balance on April 10, 2020; and (3) Shellpoint's sending the plaintiff a mortgage statement on March 19, 2020. Thus, all FDCPA claims other than those based on these three alleged violations will be dismissed as untimely.

**B.     FDCPA: Analysis of Timely Claims**

The FDCPA generally prohibits a debt collector from engaging in harassment, deception, and unfair conduct in the course of collecting a debt.[8] Three of the FDCPA's broad provisions are relevant here. First, § 1692d states:

> A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt.

15 U.S.C. § 1692d. Second, § 1692e states:

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> . . . .
>
> (2) The false representation of—
>
> (a) the character, amount, or legal status of any debt[.]
>
> . . . .
>
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt . . . .

15 U.S.C. § 1692e. Third, § 1692f states:

---

[8] Shellpoint and JBA concede that the plaintiff has adequately alleged that they are "debt collectors" as defined in the FDCPA. *See* 15 U.S.C. § 1692a(6).

12

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

15 U.S.C. § 1692f.

### 1. Claims against JBA

The plaintiff alleges that JBA violated all three of the above provisions of the FDCPA through its actions in the foreclosure suit after January 25, 2020. The plaintiff contends that the foreclosure action itself was frivolous because JBA must have known, based on plaintiff's counsel's letter of December 23, 2019, that the Miners had successfully modified their loan and therefore were not in default under the current terms of the loan. Thus, the plaintiff argues, JBA's filing a motion for default judgment on March 10, 2020 should be viewed as a form of harassment under § 1692d and a form of unfair or unconscionable conduct under § 1692f.[9] Further, the plaintiff contends that, because the loan was modified and therefore not in default, JBA's representation of the amounts owed on the loan (which included late fees and other charges based on the alleged default) in its motion for default judgment and in its subsequent notice of the loan payoff amount was false, in violation of § 1692e.

The plaintiff's FDCPA claims against JBA all depend on the plaintiff's legal position that the Miners had entered into a binding contract with either SLS, Shellpoint, or 1900

---

[9] I note that the plaintiff does not contend that JBA violated the FDCPA by filing the motion for a default judgment at a time when he was not actually in default in the foreclosure case.

13

Capital to permanently modify their loan, which, in turn, prevented the defendants from treating their loan as in default despite their failure to pay the amounts due under the original loan. This legal position underlies the plaintiff's state-law claim for breach of contract in the present case. However, even if I were to assume that the plaintiff's legal position that the loan was permanently modified is correct, it would not follow that JBA violated the FDCPA by continuing to prosecute the foreclosure case after being advised of the plaintiff's position. That is so because litigating a debatable legal position on behalf of a creditor is not a violation of the FDCPA, even if the creditor ultimately loses. *See Heintz v. Jenkins*, 514 U.S. 291, 295–96 (1995) ("[W]e do not see how the fact that a lawsuit turns out ultimately to be unsuccessful could, by itself, make the bringing of it an 'action that cannot legally be taken.'"); *Miljkovic v. Shafritz and Dinkin, P.A.*, 791 F.3d 1291, 1304–09 (11th Cir. 2015) (concluding that an attorney's litigating a debatable legal position does not violate §§ 1692d, 1692e, or 1692f even if the position ultimately is unsuccessful); *Hemmingsen v. Messerli & Kramer, P.A.*, 674 F.3d 814, 817–20 (8th Cir. 2012) (same). However, I will assume that, if JBA litigated a legal position that it knew was frivolous, then it would have violated all three of the relevant provisions of the FDCPA.

The plaintiff's argument that JBA knew its position was frivolous is as follows: The original loss-mitigation letter from SLS contained all the terms applicable to the loan-modification offer and stated that the Miners would be automatically approved for modification if they made all three trial plan payments on time and submitted "all required documents." (ECF No. 36-3 at 3 of 5.) On December 23, 2019, the Miners' counsel provided JBA with a copy of this letter and provided documentation indicating that the

14

Miners had made their three trial plan payments on time. (ECF No. 35-1.) Thus, by March 2020, when JBA filed its motion for default judgment, JBA knew that the loan had been modified and that therefore the plaintiff could not possibly be considered in default.

However, several undisputed facts show that JBA's legal position was not frivolous. First, it is undisputed that the Miners and Shellpoint had not fully executed a written loan modification agreement. It would be highly unusual for a mortgage lender or servicer to agree to a loan modification without executing a written agreement, especially since most documents associated with a mortgage are recorded in the register of deeds office of the county in which the property is located. *See* Wis. Stat. § 706.05(2m)(a) (stating requirements for "any document submitted for recording or filing that modifies an original mortgage or land contract"). Because no fully executed modification agreement existed or was recorded, JBA had good reason to think that the loan had not been modified, despite its litigation adversary's insistence that it had.

Second, SLS's original proposal for the loan modification did not unequivocally provide that the Miners' loan would be automatically modified once they made three timely trial-period payments. Importantly, the letter did not itself offer a permanent loan modification; rather, it offered the trial period plan, which the letter described as "the first step toward qualifying for more affordable payments." (ECF No. 36-3 at 2 of 5.) The letter provided that the Miners could accept the offer to participate in the trial period plan by making "the first monthly 'trial period payment'" by February 1, 2019. (*Id.*) The letter then indicated that "[t]o be approved for a permanent modification," the Miners had to make all trial-period payments on time. (*Id.*) The reference to being "approved for a permanent modification" at least arguably indicated that completing the trial plan was a necessary,

15

but not sufficient, condition to permanent modification. Finally, the letter stated that, after the Miners made all trial-period payments in a timely manner "and submit[ted] all required documents," their mortgage would "be permanently modified as described herein." (*Id.* at 3 of 5.) The reference to submitting additional documents implies that the loan would not be automatically modified once the trial period was successfully completed.

I recognize that the plaintiff may argue that the letter implied that the permanent loan modification would take effect as soon as the Miners made the timely trial payments and then submitted the required documents. Under this argument, the mortgage servicer would have been obliged to modify the loan as soon as the Miners made the payments and then returned the loan modification agreement, and the servicer would not have had a right to refuse to countersign the agreement for any reason. However, I do not believe that the existence of this argument rendered JBA's position that the loan had not been modified frivolous. Again, the letter contained language arguably indicating that the permanent loan modification was subject to further approval even if the Miners made the required payments, including stating that completing the trial plan was "the first step toward *qualifying*" for a permanent modification, and that the Miners would still need "[t]o be approved for a permanent modification" after completing the trial payments. (ECF No. 36-3 at 2 of 5 (emphasis added).) Thus, it was at least debatable whether the terms of the letter required Shellpoint to approve the permanent loan modification once the Miners returned the modification agreement.

Finally, I note that the letter from plaintiff's counsel claims that a representative of Shellpoint told Tiffany that Shellpoint would "honor" the loan modification agreement. (ECF No. 35-1 at 2.) To the extent that plaintiff means to argue that the representative's

16

statement was sufficient to bind Shellpoint to the loan modification, JBA's litigation position would still have been non-frivolous. Importantly, counsel's letter did not contain indisputable proof that a Shellpoint representative had told Tiffany that Shellpoint would honor the modification. Further, JBA was not required to accept counsel's factual representation as true; instead, it was entitled to test that representation through further litigation. *See Miljkovic*, 791 F.3d at 1306–07 (noting that FDCPA does not require creditor's counsel to accept consumer's factual representations as true).[10]

In short, because JBA was entitled to litigate the issue of whether the plaintiff's mortgage had been permanently modified, it did not violate the FDCPA by taking actions in the foreclosure case that were consistent with its position that the loan was not modified and therefore was in default. This included filing the motion for default judgment after the plaintiff failed to file a responsive pleading in the foreclosure case and claiming amounts due that were based on the plaintiff's being in default under the terms of the original loan. Accordingly, the FDCPA claims against JBA will be dismissed.

## 2. Claims Against Shellpoint

The plaintiff's remaining claim under the FDCPA is that Shellpoint violated §§ 1692d, 1692e, and 1692f by sending a periodic mortgage statement to him on March 19, 2020. The complaint alleges that this mortgage statement "erroneously alleged a

---

[10] Counsel's December 23 letter also advised JBA that "the only reason that Ms. Miner's mortgage loan went into default was because Shellpoint inexplicably ceased accepting Ms. Miner's monthly payments." (ECF No. 35-1 at 1.) Again, however, counsel provided no proof to support this factual representation. Although later in the letter counsel referred JBA to "Group Exhibit D" in support of his claim that "Shellpoint continued to reject Ms. Miner's payment" (*id.* at 2), that exhibit shows only that Shellpoint considered the loan to be in default. It does not indicate that Shellpoint refused to accept any payment from the Miners. Thus, JBA was not compelled to accept counsel's factual representation as true.

17

default of $16,958.20," "asserted an inflated amount due of $79,071.37," "falsely stated that the subject loan was 443 days delinquent," and "contained a payment coupon that stated '[d]etach and return with payment.'" (Am. Compl. ¶ 97.) The complaint alleges that the mortgage statement further stated that "[t]he loan is in default for failure to pay amounts due," that "you are late on your loan payments and the foreclosure process has been initiated," and that "[f]ailure to bring your loan current may result in fees and foreclosure—the loss of your home." (*Id.* ¶ 98.) Finally, the complaint alleges that the mortgage statement "falsely stated that the total amount due was $16,958.20 and that the Miners '**must pay this amount to bring [their] loan current**.'" (*Id.* ¶ 99 (emphasis in mortgage statement).)

Although the mortgage statement is not attached to either the complaint or any defendant's motion to dismiss, it is clear from the complaint's allegations that the statement conformed to TILA's Regulation Z, which requires a mortgage servicer to send a consumer a periodic statement meeting certain requirements. *See* 12 C.F.R. § 1026.41(a)(2). Under that regulation, a periodic statement must include an amount due, *id.* § 1026.41(d)(1); state any amount past due, *id.* § 1026.41(d)(2)(iii); state the length of the consumer's delinquency, *id.* § 1026.41(d)(8)(i); advise the consumer of possible risks, such as foreclosure and expenses, that may be incurred if the delinquency is not cured, *id.* § 1026.41(d)(8)(ii); and advise the consumer of the total payment amount needed to bring the account current, *id.* § 1026.41(d)(8)(vi). Further, Regulation Z includes a sample form that uses the exact language that the plaintiff quotes in his complaint. *See* 12 C.F.R. part 1026, App. H, Sample Form H-30(B). For example, the sample form states that "[f]ailure to bring your loan current may result in fees and foreclosure—the loss of your

home." *Id.* Further, the sample form states, in the same boldface type used in the plaintiff's complaint, that "**You must pay this amount [i.e., the total due] to bring your account current**." *Id.* Finally, the sample form contains a payment coupon that the consumer may detach and return with his or her payment.

Shellpoint contends that, because it was required by TILA and Regulation Z to send the periodic statement, sending the statement could not be viewed as a communication "made in connection with the collection of a debt." If the statement was not made in connection with the collection of a debt, Shellpoint notes, then it was not subject to the FDCPA's requirements. However, I need not address whether this argument is correct. That is so because, even if the mortgage statement was sent in connection with the collection of a debt, the complaint does not allege facts plausibly showing that the statement violated the substantive provisions of the FDCPA.

First, it is obvious that sending a mortgage statement that contains only information that a mortgage servicer is *required by law* to provide to a consumer cannot be considered "conduct the natural consequence of which is to harass, oppress, or abuse any person." Thus, Shellpoint's sending the statement could not have violated § 1692d. For the same reason, sending the mortgage statement cannot be considered "the use [of] unfair or unconscionable means to collect or attempt to collect any debt." Thus, sending the statement could not have violated § 1692f.

As for § 1692e, the plaintiff alleges that the mortgage statement contained false statements about delinquency and the amount owed because the statement assumed that the loan had not been modified and therefore was still in default. However, as explained in my analysis of the plaintiff's claims against JBA, at the time the statement

19

was sent, the parties were engaged in a bona fide dispute over whether the loan had been modified. If the loan had not been modified, then the information contained in the mortgage statement was entirely accurate. Until the parties' dispute was resolved, it was not false to describe the amounts due and other aspects of the account consistently with Shellpoint's view that the loan had not been modified. Accordingly, Shellpoint's sending the periodic mortgage statement did not violate § 1692e.

## C.    No Leave to Amend

Having dismissed the plaintiff's FDCPA claims, I consider whether to grant leave to amend. *See, e.g., White v. Ill. State Police*, 15 F.4th 801, 808 (7th Cir. 2021) (reminding district courts "that a plaintiff should ordinarily 'be given at least one opportunity to try to amend her complaint before the entire action is dismissed'"). A district court may deny leave to amend if any amendment would be futile. *See, e.g., Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 707 (7th Cir. 2021).

Here, I conclude that granting leave to amend would be futile. First, the plaintiff does not dispute that the FDCPA's statute of limitations bars any claim based on violations that occurred before January 25, 2020; therefore, any attempt to amend claims that are based on violations that occurred before that date would be futile. Second, the plaintiff has not proposed any specific amendments, and I cannot envision a plausible amendment that would result in the complaint's stating valid FDCPA claims based on JBA's prosecution of the foreclosure action or Shellpoint's sending the periodic mortgage statement. Finally, the plaintiff has already been granted one opportunity to amend his complaint in response to the defendants' motions to dismiss yet was unable to state a valid FDCPA claim. *See Always Towing*, 2 F.4th at 707 (failure to state a claim after

20

receiving one opportunity to amend original complaint "indicates the futility of granting further leave to amend"). Accordingly, I will dismiss the FDCPA claims with prejudice.

**D.      Relinquish Supplemental Jurisdiction**

Because I have dismissed all federal claims, I will relinquish supplemental jurisdiction over the plaintiff's state-law claims. *See* 28 U.S.C. § 1367(c)(3). Those claims will be dismissed without prejudice.

**III. CONCLUSION**

For the reasons stated, **IT IS ORDERED** that the motions to dismiss of defendants JBA and Shellpoint (ECF Nos. 34 & 36) are **GRANTED** to the extent that the plaintiff's FDCPA claims against them, and the plaintiff's TILA claim against Shellpoint, are dismissed with prejudice. Further, defendant SLS's motion to dismiss (ECF No. 32) is **GRANTED** to the extent that that the plaintiff's TILA claim against it is dismissed with prejudice. The court relinquishes supplemental jurisdiction over all state-law claims, and therefore the defendants' motions to dismiss the state-law claims on the merits are **DENIED** as **MOOT**.

Dated at Milwaukee, Wisconsin, this 20th day of January, 2022.


s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge